Good morning. I appreciate this opportunity to be heard on behalf of Mr. Bayona. We were advised to discuss the case of Alcaraz in a letter and how it applies to Mr. Bayona's case. I'm prepared to do that. I have briefed other issues in my brief, and I would simply rely on those briefs. THE COURT You may argue whatever you wish, but just be sure that you include what we suggested that you include. BAYONA Well, I will, Your Honor. I think in order to do that, a brief recitation of the procedural facts are important. Mr. Bayona entered the on a student visa, and that is found in the Certified Administrative Record at page 220. On June 4, 1993, he committed a crime of attempted fraudulent use of a credit card. On July 8, he pled guilty to that charge of attempted fraudulent use of a credit card. He received a suspended sentence of one year. And on November 5, in order to show cause under the existing law at that time, was served on Mr. Bayona. He appeared in court, and at subsequent time filed an application under Section 244A of the Act, as it existed at that time, commonly referred to as suspension of deportation. On July 27, 1995, the judge denied that application. He denied it not on the merits, but denied it because he found that Mr. Bayona was statutorily ineligible to qualify, because he was statutorily ineligible to demonstrate good moral character. THE COURT Why do you say that's not on the merits? Well, it's not on the merits of the hardship issues. He never got to the hardship issues. But it is a substantive part of the statute. It's a substantive part of the statute. We disagreed. The judge found that the conviction fell within Section 212A at the time, and individuals convicted of those crimes identified in Section 212A are statutorily barred under Section 101F at that time. The law of 1995 relating to suspension of deportation in 244A, there were two ways that a person could qualify. Subsection 1 required seven years of continuous residence, good reference to aliens that were deportable for the commission of certain acts, including crimes under Section 212, crimes of moral turpitude, excuse me, Section 241A.2 relating to crimes of moral turpitude. And that section allowed suspension of deportation to be granted if a person had accumulated ten years of residency after the commission of the crime, and also had otherwise good moral character and could demonstrate extreme hardship. Now, as to Alcaraz, Your Honor, and how it relates to repapering, the facts in that case are different, and I think that makes it somewhat fatal to my client. In that case, the Alcaraz family placed themselves into proceedings April 15, 1996, prior to Ara Ara, and applied for suspension of deportation. However, their case was not called until June 1997, and was denied because of the Ara Ara stop time rule. And in that case, a panel of this court found a solution under Section 309C.3 of the Ara Ara, and remanded the case to the board with the intention of allowing the government to repaper, or to administratively close the case and allow the government to repaper. And the advantage of that to the Alcaraz family would be that they could now apply for cancellation of removal under the new law, showing ten years and trying to show exceptional hardships. And perhaps that's a benefit to the Alcaraz family. However, it does not benefit my client because, first of all, his case took place entirely before the passage of Ara Ara, and he simply doesn't qualify under the law for repapering. Second, repapering would not help him because it brings into effect the stop time rule, and his ten years would have stopped three or four years after his entry, or some period of time after his entry, but certainly less than ten years. However, Alcaraz is instructive because it cites a case, Jimenez-Angeles v. Ashcroft, and in fact it quoted from the case to point out that an alien in deportation proceedings before 1996 continued to approve time towards satisfying the seven-year residency requirement for suspension of deportation during dependency of the proceedings. Now, I notified the court by letter and notified counsel by letter that what I was going to do was to argue that this case be remanded to the board, to allow the board to remand it to the court, because at this point in time my client does have both the seven years and the ten years since the commission of his offenses. And there is no stop time rule that comes into play under Section 244A of the law that existed at that time. There is no final order of deportation. This case has been pending before the board. Why is there no stop time rule in your client's case? Within the statute, there is nothing that stops the running of the residency, the period of residency within the statute. And in fact, at that period of time, having practiced law during that period of time, it was common practice for immigration judges, either over the objection or with the acquiescence of the INS trial counsels, to postpone cases. To continue to run? Yes, to postpone them for as much as a year. I thought that when Congress changed that, that they made it retroactive in the sense that it would apply to cases that were pending. This case had completed its processing before the immigration court. And I believe that they made it, that 309C, related to cases that were pending before the immigration court. Cases that had started with orders to show cause, but were still pending and had not had their hearings yet. So you're saying everything here was completed before the statute's effective date? Yes, that's a fact, yes. Everything was completed before the statute's effective date. And the reason the reason I think that would make sense is because the statute itself made reference to cases that were started before and still had not had their re-papering specifically referred to those types of cases. It was a it was a safeguard measure for those individuals who were in proceedings under an old law, but were found themselves caught by the passage of a new law, had no idea it was going to happen, and then they were sitting there because of the long passage of time in immigration courts after the passage of the new law, suddenly finding themselves no longer subject to their relief that they had. If we decide that your client is subject to deportation or removal because of lack of good moral character, would sending it back do any good? Yes. Under 244A subsection 2, even though a person has a criminal act relating to that good moral character, a criminal act, let's say, that's found in section 241 or section 212, the subsection 2 specifically applies to those types of individuals, and it gives a separate period of residency of 10 years from the date that that act was committed. There's a much more liberal law. Section 1... The stop-time rule. The stop-time rule in ARA-ARA? Right. Because by the terms of the statute itself, it only applies to cases that had not been decided before. Thank you. You've just about used your time. We'll give you a minute on rebuttal, but we should hear from the Governor. Thank you. Good morning, Your Honors. May it please the Court? I'm Allison Drucker, representing the United States. Petitioner was convicted of a criminal moral turpitude. Since then, his claim of suspension has been rejected by the immigration judge and twice by the BIA. To prevail on the suspension claim, he must win on two issues, the physical presence issue and the good moral character issue. Petitioner also has raised, and this Court, of course, also asked, that we speak of the question of whether the Court should remand this for repapering as in Alcaraz. I thought in his argument today he said he wasn't pressing repapering. Well, I think that was in his briefs, but that in his argument today he said repapering wouldn't help his client. Maybe I misunderstood. Well, perhaps I have, Your Honor. The stop time rule clearly operates in this matter because of the Court's decision in RAM which made it clear that there was no problem with retroactively applying that new rule to convictions regardless of when those convictions occurred, including those predating the enactment of ARERA. So we don't see any way that he can get around. When was his conviction? The conviction was, let's see, 1993. Now, in terms of the good moral character, he has to deal with that, and he has two ways that he's proposed in his brief to eliminate that problem. One is by arguing about expungement, and one is arguing about the petty offense exception. And in our view, neither of those can solve his problem. The argument that he makes about expungement would require the Court to find that the definition of conviction that came in with ARERA 322C doesn't control this case. And to take that position would conflict with the plain language of the statute. This Court's dicta in Toya v. Fasano, as well as cited in a brief, the dicta in the Supreme Court in St. Cyr and the holdings of, I believe, every circuit court to consider the question. So I think it's clear that the new law, the ARERA provisions, relate both in terms of the stop-time rule and in terms of the good moral character to both of those aspects of his case, such that he can't prove up either of them for suspension. Let me go back to the stop-time rule. I thought, before the argument started, that Ram was controlling, because we've got this case here, and it seemed to me that Ram's saying that the stop-time rule applies to convictions predating the Act, or to proceedings on that. But I thought he was arguing that everything in his case was decided before the effective date of the Act, and that Ram should be limited to cases that are somehow in process. I'm not sure where he's deriving this argument. First of all, factually, it doesn't seem correct. Certainly he was in proceedings starting in 1993, but then the Board didn't make even its first decision in this case until 2001. So the case was definitely a live case after ARERA was enacted. I'm confused about why this is so protracted. He was originally convicted in 1993, and he got an order to show cause charging with deportability very soon after that. And the IJ denied suspension in 1995. He appealed to the BIA. Right. And nothing happened there until 2001? Apparently that's true, Your Honor. Was he sitting on appeal for six years? I don't have any particular explanation as to why this case, as opposed to any other case, was there for a particular length of time. I'm sure from your experience here on the bench that all three of you are aware that unfortunately in the past there have been many lengthy delays of cases before the Board, and I'm sure that the Board has been for a period extremely overwhelmed by its caseload, and a lot of things sat longer than they should have. As I say, I don't have any explanation about this individual case or the issues in this individual case that would clarify why that may have happened here, as opposed to in a different situation. Of course, the Board is very much in the last few years trying very hard to catch up with its caseload. I'm sure you're aware of some of the new procedures they put into it. And they seem to be having some success, at least with reducing the period of time. Well, that's what I was saying. Notice I was saying, if you're looking at the time that cases are before the Board before they're decided, you may not always agree with how they're decided. In 2001, the BIA dismissed the appeal, but didn't talk about the petty crime exception. So then he went to this Court, and in 2002, the government filed an unopposed motion to remand to the BIA to explain what it did after waiting six years to file the decision. There were a couple of problems with the Board looking for a score decision, unfortunately. That was one, Your Honor. There was another. I don't think that they reflected the change in the law that had occurred during that period. It's all very regrettable. Then it applies the new law and says he's out of luck, the stop-time rule and all of that. It's all very regrettable, but how would this have been that different if they had... That's what I'm asking. If the BIA had originally acted promptly on his appeal and had all of this stuff, he would have been out, or would he have been entitled to take advantage of the expungement? Well, I mean, Arrero was enacted, I'm trying to think, I guess the permanent rules became effective on April 1st of 1997. I mean, even if the Court had decided this years earlier than they did, it would have been surprising if they would have been able to decide it, you know, quickly before Arrero came into effect. Before Arrero was enacted, would he have been entitled to any relief as a minor crime or anything like that? You mean that petty offense exception? Is that what you're talking about? Well, the petty offense exception, as I understand it, hasn't changed during this period. The law on the expungement, that has changed over time. But the petty offense exception has been the same. And we think it's quite clear that he didn't then and does not now fall within that exception. I mean, the plain language of the exception says, if the alien is convicted, he must not be sentenced to a term of imprisonment in excess of six months, regardless of the extent to which the sentence is ultimately executed. There's also board law, which I think deserves deference in this situation, which was decided in 1997 and says, it was cited in the board's second decision. Matter of SS, which supports the idea that the fact finder should look only to the term of the sentence that's imposed and that, you know, to what extent the sentence is or isn't executed is irrelevant. Now, petitioner's sentencing document, which is in the record at 174 to 76, provides that he was sentenced to one year in the Nevada Department of Prisons, said sentence suspended and defendant placed on probation. This all seems very clear. I mean, there's nothing unusual about the way this was constructed. And I don't see any hope for him. As I say, the statute hasn't changed over time. Your time has expired. Thank you, Your Honor. How much time do I have? One minute? You would think my client could have gotten married to some nice American citizen in the last ten years, wouldn't you? At that time, expungements did away with crimes of moral turpitude. That was the law. That was the practice. That was in the Foreign Affairs Manual. And the reason is because there was no definition of conviction back then. The definition of conviction did not come about until Ara Ara was passed. And therein lies the petty crime exception defense also, because the definition of conviction did not exist. A definition did not exist back then. And I'll brief that in my brief. I'll leave it at that. I just want to make it clear that Ram, Alcaraz, Jimenez, all of those cases dealt with cases that went into proceedings with an order of show cause and did not get decided by the immigration judge to act after Ara Ara. Why does it matter if it's the immigration judge or the BIA? Because the statute specifically referred to cases that no decision had been reached by the immigration court. By what? By the immigration court. I believe that's what the statute specifically said. And which statute is that? That's 309. This is of Ara Ara, 309. C3 and C5, I believe it is. C5 is the stop time and C3 is the re-papering statute. And to make it clear, no, I'm not suggesting that this is a re-papering case. Thank you. You're welcome. It's just argued it's submitted for decision. We'll hear the next case, which is Maldonado v. Ashcroft.
judges: Schroeder, Gould, Clifton